**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DOUGLAS JAMES GENIS, | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 12-300 |
| SUPERINTENDENT, SCI ALBION, | ) | Judge Arthur J. Schwab |
| et al., | ) | |
| Respondents. | ) | |

**O P I N I O N**

**I.**      **Introduction**

Before this Court is a petition for a writ of habeas corpus filed by Petitioner, Douglas James Genis, pursuant to 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). He is challenging the judgment of sentence imposed upon him by the Court of Common Pleas of Crawford County on October 12, 2004. Petitioner raises a Sixth Amendment claim that his trial counsel was ineffective. He also claims that his Fourteenth Amendment due process rights were violated because the prosecution violated its obligations under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963) and because it introduced "false" evidence at his trial.

After careful consideration, the Court concludes that Petitioner is not entitled to habeas relief on his claims. Therefore, his petition will be denied. A certificate of appealability also will be denied.

**II.**      **Discussion**

**A.      Factual and Procedural Background**

In 2003, Petitioner was charged in the Court of Common Pleas of Crawford County with numerous crimes relating to the sexual molestation of "B.B." She was age 12 and 13 at the time

1

the multiple incidents of abuse were alleged to have occurred and Petitioner was around age 32.

Bruce Barrett, Esq., represented Petitioner at his trial. The state court subsequently summarized

some of the evidence introduced at Petitioner's trial as follows:

> B.B. was fourteen-years-old at the date of trial and testified to events that occurred during the two-years prior. N.T., 48:19-20; 55:9-16. She testified at trial that petitioner began molesting her on December 31, 2001 at his parent's house; kissing, hugging, touching her vagina over her clothing and compelling her to touch his penis. Id. at 55:9-16. Petitioner warned B.B. at that time that if she told anybody, he'd go to jail. Id. at 58:11-12. The molestation began with fondling and kissing, but by the end of February escalated to digital penetration of B.B.'s vagina. Id. at 61:20-21; 65:24-25. B.B. testified that the abuse occurred on a twice-monthly frequency during occasional weekend visits. During the spring of 2002, petitioner moved from his parent's home into a nearby trailer. Id. at 64:2-5. Here, B.B. testified that petitioner "tried to have sexual intercourse" with her and then performed cunnilingus. Id. at 65:14-15; 69-21-22. B.B. testified that no one else had penetrated her vagina. Id. at 150:9-13.

> The abuse was occasioned by B.B.'s frequent overnight visits to petitioner throughout the spring and summer, and a one-week stay in the time shortly after B.B.'s birthday. Id. at 145:2-7. B.B. explained that she prayed that petitioner would stop, Id. at 101:16-21; but it was not until November of 2002 that she reported the abuse to her bus driver who, in turn, reported it to the school. Id. at 139:3-9; 140:22-24. On November 19, 2002, B.B. recorded her complaint on paper, writing "he stuck his finger in 'there' and he also did something he called 'eating out.'" Commonwealth's Trial Exhibit, 3; Id. at 138:1-8; 143:8-15. Melissa Caldwell, B.B.'s mother, testified that, despite her longstanding relationship with petitioner, B.B. had no contact with petitioner until November 2001. Id. at 153:24-25; 154:1-2. She permitted B.B.'s frequent overnight visits to petitioner [to] cultivate a "friendship." Id. at 155:10-14; 160:21-23; 161:1-3. And she indicated that B.B.'s visits were always alone. Id. at 155:15-18.

> [Forensic Nurse Examiner Rhonda] Henderson gave testimony at trial that she conducted an "extensive genital exam." She testified that she treated B.B.['s] situation as a "chronic case" of abuse, Id. at 111:14-15, and looked for "evidence of scarring or injury … subsequently healed since the actual crime." Id. at 110:5-6 And Henderson found what she set out to find. In communicating her findings to the jury, Henderson describes significant injury to B.B.'s genitals, including "transaction of a [ ]cutting, per se, to the hymeneal tissue … one at three o'clock, one at nine o'clock." Id. at 115:19-2. Lastly, she observes, "there was also injury … on the outside of the labia." Id. at 116:7-8. Henderson waxed on in great detail, using visual aids from the examination, See Commonwealth Exhibits 5-9, to

describe and demonstrate the "injuries" she observed in the victim. Id. at 109:1 *et seq.*

Finally, petitioner also testified on his own behalf collaborating the victim's statements regarding the nature of their relationship and dealings. While denying the actual sexual crimes, he otherwise gave considerable credence to B.B.'s testimony. Petitioner acknowledged that he and B.B. spent a great deal of time together between January and July of 2002. As he relates it, they spent time swimming, doing calligraphy and ceramics and frequently watching movies. Id. at 201:22-25; 202:1. B.B. stayed overnight on a regular basis between January and July of 2002 – at least twice a month on the weekends, and a full week during the summer. Id. at 190:2-3; 201:7-9. He admitted that B.B. slept in the same room as himself despite that other rooms were available. Id. at 194:10-17. Petitioner also sent B.B. birthday, Christmas and Valentine's Day cards and gifts on an on-going basis. Id. at 200:6-25; 201:1-6. Petitioner used and encouraged the use of pet names for each other (he calling her "beautiful" and she calling him "crazy" after a movie title), Id. at 214:20-25; 215:1-25, and frequently exchanged notes and emails with the victim. The notes were exploitive, if not manipulative, considering B.B.'s "crush" on petitioner. Id. at 211:4-16; 212:10-12; the language is more reminiscent of an adolescent romance than an individual seeking to cultivate a healthy father-daughter relationship as petitioner claimed. Id. at 217:5-10; 219:16-20. In one example, petitioner writes to B.B.: "I wish for just one moment you could be me just so you could know how much I love you." Id. at 219:16-19. Elsewhere he continues in the same vein: "[s]itting here telling you how much I love you would be telling something you know very well – not to mention what we feel when we're around each other or the lonlienss [sic] or how we make each other laugh or smile. There's so much more, I could fill this page." Id. at 217:5-10.

(RR[1] at 412-14 (italicized and bracketed text in original)).

On March 14, 2004, the jury found Petitioner guilty of five counts of involuntary deviate sexual intercourse, twelve counts of indecent assault, five counts of aggravated indecent assault, and one count of corruption of minors. On October 12, 2004, the trial court imposed a sentence of 13-45 years of imprisonment.

---

[1] On August 29, 2013, Respondents submitted a one volume Reproduced Record ("RR"). The pages therein are numbered 1 through 452, and shall be cited to as "RR at __." Respondents also have submitted in two volumes the transcripts of all relevant proceedings that took place in Petitioner's state case.

Mark Stevens, Esq., represented Petitioner at his sentencing and on direct appeal, in which he raised claims not relevant to this proceeding. On November 16, 2005, the Superior Court of Pennsylvania affirmed Petitioner's judgment of sentence. (RR at 72-81).

In August of 2006, Petitioner filed a *pro se* motion for collateral relief pursuant to Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. § 9541 *et seq.* (RR at 115-22). The PCRA court appointed Gary M. Alizzeo, Esq., to represent him, and Alizzeo filed an amended PCRA motion. (RR at 123-28). Petitioner claimed that his trial attorney, Barrett, provided him with ineffective assistance because he:

(1)     failed to seek to quash the amended information that added five charges of a higher grade and degree;

(2)     failed to seek to dismiss the information on the ground that its amendment was a denial of due process;

(3)     failed to request an alibi instruction;

(4)     failed to request a competency hearing on the victim outside the hearing of the jury;

(5)     failed to object to the prosecutor presenting her personal opinion as to Petitioner's guilt during her closing argument; and,

(6)     failed to impeach the victim witness with evidence of bias.

(RR at 130).

The PCRA court presided over an evidentiary hearing on January 2, 2008, at which Petitioner and Barrett testified. The PCRA court subsequently issued a Memorandum and Order in which it denied Petitioner's request for PCRA relief. (RR at 133-35). It held that Petitioner's first two claims of ineffectiveness were waived for failing to present evidence to support them. (RR at 131). It denied Petitioner's remaining claims for lack of merit. (RR at 131-42).

4

Petitioner, through Alizzeo, filed an appeal with the Superior Court in which he raised only one claim: that the PCRA court erred in denying his claim that Barrett was ineffective for failing to request an alibi instruction and failing to object to the trial court's omission of such an instruction. (RR at 144-59). The Superior Court denied that claim on the merits in a Memorandum it issued on December 2, 2008. (RR at 186-93).

In June of 2010, Petitioner filed a second PCRA motion in state court (RR at 231-39) pursuant 42 Pa.C.S. § 9543(a)(2)(vi), which is "the provision of the state post-conviction relief act dealing with claims of innocence based on after discovered evidence." Albrecht v. Horn, 485 F.3d 103, 123 (3d Cir. 2007). Subsection 9543(a)(2)(vi) provides that a state prisoner may obtain post-conviction relief if he demonstrates by a preponderance of the evidence that exculpatory evidence has become available that, if it had been available at trial, "would have changed the outcome of the trial if it had been introduced."

The PCRA court appointed Edward J. Hatheway, Esq., to represent Petitioner, and he filed a second amended PCRA motion on Petitioner's behalf in which it was alleged that newly discovered evidence had recently come to light that completely discredited the testimony that Nurse Henderson had given at Petitioner's trial. This new evidence, it was alleged, entitled Petitioner to relief under § 9543(a)(2)(vi). (RR at 273-92).

The PCRA court presided over an evidentiary hearing on July 26, 2011. Petitioner presented the testimony of Dr. Kathleen Brown, an expert and researcher in the field of forensic nursing. The PCRA court was persuaded by Dr. Brown's testimony and determined that Henderson's trial testimony was discredited. Nevertheless, it held that Petitioner failed to establish that he was entitled to postconviction relief under § 9543(a)(2)(vi) because he had not shown that the new evidence was exculpatory or that it would have changed the outcome of his

5

trial. (RR at 401-19). In a Memorandum dated May 11, 2012, the Superior Court affirmed the PCRA Court's decision. (RR at 443-50).

Having received no relief in state court, Petitioner, through a new attorney, filed with this Court a petition for a writ of habeas corpus [ECF No. 1 at 1-15] and a supporting Memorandum of Law [ECF No. 1 at 16-46]. He raises a Sixth Amendment claim that his trial counsel (Barrett) was ineffective. He also claims that his Fourteenth Amendment due process rights were violated because the prosecution introduced false evidence at his trial and because it did not comply with its obligations under Brady v. Maryland, 373 U.S. 83 (1963).

Respondents have filed their Answer [ECF No. 2] in which they argue, *inter alia*, that Petitioner's claims are procedurally defaulted and also have no merit. Petitioner did not file a reply. See Local Rule 2254(E)(2) (a petitioner "may file a Reply ... within 30 days of the date the respondent files its Answer.").

### B.    Sixth Amendment Claim

**(1)    The only ineffective assistance of counsel claim that Petitioner did not procedurally default is the claim that Barrett was ineffective for failing to request an alibi instruction**

Although it is not entirely clear, Petitioner may be raising the four ineffective assistance of counsel claims that the PCRA court denied on the merits in the first PCRA proceeding. This appears to be the case because in the argument section of his Memorandum of Law, Petitioner focuses solely on the PCRA court's decision to deny those four claims and argues that it does not withstand review under AEDPA. [ECF No. 1 at 40-42]. Importantly, Petitioner fails to discuss the Superior Court's subsequent decision, which denied on the merits the only claim before it,

which was that Barrett was ineffective for failing to request an alibi instruction. As explained below, that is the only ineffective assistance claim that this Court can review on the merits.

To the extent that Petitioner is arguing that he is entitled to habeas relief because Barrett failed to request a competency hearing on the victim outside the hearing of the jury, or to object to the prosecutor presenting her personal opinion as to Petitioner's guilt during her closing argument, or to impeach B.B. with evidence of bias, those claims are denied because Petitioner did not exhaust them in state court and, therefore, he has procedurally defaulted them.

The exhaustion requirement is "grounded in principles of comity; in a federal system, the States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights." Coleman v. Thompson, 501 U.S. 722, 731 (1991). See also O'Sullivan v. Boerckel, 526 U.S. 838, 842-49 (1999).

> [It is] principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings. See Braden v. 30th Judicial Circuit Court of Kentucky, 410 U.S. 484, 490-491, 93 S.Ct. 1123, 1127, 35 L.Ed.2d 443 (1973). Under our federal system, the federal and state "courts [are] equally bound to guard and protect rights secured by the Constitution." Ex parte Royall, 117 U.S. [241, 251, 6 S.Ct. 734, 740 (1886)]. Because "it would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation," federal courts apply the doctrine of comity, which "teaches that one court should defer action on causes properly within its jurisdiction until the courts of another sovereignty with concurrent powers, and already cognizant of the litigation, have had an opportunity to pass upon the matter." Darr v. Burford, 339 U.S. 200, 204, 70 S.Ct. 587, 590, 94 L.Ed. 761 (1950). See Duckworth v. Serrano, 454 U.S. 1, 3, 102 S.Ct. 18, 19, 70 L.Ed.2d 1 (1981) (per curiam) (noting that the exhaustion requirement "serves to minimize friction between our federal and state systems of justice by allowing the State an initial opportunity to pass upon and correct alleged violations of prisoners' federal rights").

Rose v. Lundy, 455 U.S. 509, 517 (1982) (footnote omitted).

Importantly, in order to exhaust a claim, "state prisoners must give the state courts *one full opportunity* to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan, 526 U.S. at 845 (emphasis added). In Pennsylvania, this requirement means that a petitioner in a non-capital case *must have presented every federal constitutional claim raised in his habeas petition to the Superior Court either on direct or PCRA appeal*. See, e.g., Lambert v. Blackwell, 387 F.3d 210, 233-34 (3d Cir. 2004).

Here, the only ineffective assistance claim that Petitioner raised to the Superior Court is his claim that Barrett should have requested an alibi instruction. Because he did not raise any of his other ineffective assistance claims in his appeal to the Superior Court, those claims now are procedurally defaulted. See, e.g., Lines v. Larkin, 208 F.3d 153, 160 (3d Cir. 2000); Werts v. Vaughn, 228 F.3d 178, 192 (3d Cir. 2000). See also Rolan v. Coleman, 680 F.3d 311, 317 (3d Cir. 2012) ("Procedural default occurs when a claim has not been fairly presented to the state courts (i.e., is unexhausted) and there are not additional state remedies available to purse[.]"). Like the exhaustion doctrine, the doctrine of procedural default is "grounded in concerns of comity and federalism," Coleman, 501 U.S. at 730, and it bars federal habeas review of a claim whenever the petitioner failed to raise it in compliance with a state's procedural rules. Edwards v. Carpenter, 529 U.S. 446, 451 (2000); Wainwright v. Sykes, 433 U.S. 72 (1977); Lines, 208 F.3d at 162-69.

Based upon all of the foregoing, the claims that Barrett was ineffective because he failed to request a competency hearing on the victim outside the hearing of the jury, failed to object to the prosecutor presenting her personal opinion as to Petitioner's guilt during her closing argument, and failed to impeach B.B. with evidence of bias will be denied as procedurally defaulted.

8

**(2)     Petitioner is not entitled to habeas relief on his claim that Barrett was ineffective for failing to request an alibi instruction**

The only ineffective assistance of counsel claim that Petitioner did not default is his claim that Barrett was ineffective because he failed to request an alibi instruction and did not object when the trial court did not provide one.

**(a)     Background**

The PCRA court presided over an evidentiary hearing on this claim on January 2, 2008, at which Petitioner and Barrett testified. It subsequently issued a Memorandum and Order in which it denied the claim on the merits. (RR at 133-35). The Superior Court affirmed the PCRA court's decision in a Memorandum it issued on December 2, 2008. (RR at 186-92). It "note[d] that [Petitioner] did not contest the fact that he failed to provide an alibi for the bulk of the time period between January 2002 and July 2002. The victim testified that [Petitioner] initiated sexual contact with her on numerous occasions when she stayed at his residence on the weekends in January 2002 through July 2002. [Petitioner] focused solely on the time period of July 15, 2002 through July 19, 2002, in which the victim spent the week at his residence." (RR at 188). It also held:

> [Petitioner] contends that his testimony and his school attendance records entitled him to a jury instruction on alibi. [He] avers that it was impossible for him to have had sexual relations with the victim in July during the week that he was attending class in Pittsburgh because he would not have left her in his trailer by herself while he was in class. Accordingly, [Petitioner] contends that he was entitled to an alibi instruction because he was not with the victim the same week in July that she alleged the sexual assaults occurred. Additionally, [Petitioner] alleged that his trial counsel was ineffective for failing to request the charge and failing to object to the trial court's omission of the alibi instruction
> - - -
> [T]he rule regarding the issuance of an alibi instruction to the jury is as follows.
>
> > The Commonwealth has the burden of proving every essential element necessary for conviction. If the defendant traverses one of

those essential elements by evidence of alibi, his evidence will be considered by the jury along with all the other evidence. It may, either standing alone or together with other evidence, be sufficient to leave in the minds of the jury a reasonable doubt which, without it, might not otherwise exist. It will be the duty of the trial judge to carefully instruct the jury as to the relationship of the evidence of the prosecution and the evidence of the defendant as each bears upon the essential elements of the crime charged. This must be done without unfair disparagement although the trial judge must be left free to comment upon the evidence as he has done heretofore, so long as he leaves the jury free to find its own true verdict.

Commonwealth v. Willis, 520 Pa. 289, 293-94, 553 A.2d 959, 961-62 (1989) (citations omitted). Additionally, the testimony of the accused may be sufficient in itself to raise an alibi defense and entitle the defendant to an appropriate jury instruction. Id. at 294, 553 A.2d at 962 (citation and quotation marks omitted).

However, an alibi instruction is required only in cases where a defendant's explanation places him at the relevant time at a different place than the scene involved and so far removed therefrom as to render it impossible for him to be the guilty party. Commonwealth v. Collins, 549 Pa. 593, 603, 702 A.2d 540, 545 (1997) (citation omitted). Where a defendant's own testimony places him close enough to the scene that it would not have been impossible for him to have committed the crime, our Supreme Court has held that no alibi instruction is required. Id., at 603, 702 A.2d at 545 (citing Commonwealth v. Johnson, 538 Pa. 148, 152-53, 646 A.2d 1170 (1994) (defendant's testimony placed him within 150 feet of the scene); Commonwealth v. Young, 460 Pa. 598, 601-02, 334 A.2d 252 (1975) (defendant's testimony placed him within the area of the murder at the time it was committed); see also Commonwealth v. Pounds, 490 Pa. 621, 635, 417 A.2d 597, 604 (1980) (Larsen, J., dissenting) (it is not necessary to give an alibi instruction when the murder occurs in the living room and the defendant testifies that he was in the kitchen all evening)).

The victim testified that [Petitioner] initiated sexual contact with her on New Years Eve 2001. See N.T. Jury Trial, 3/16/04, at 56. This contact continued from January 2002 until April 2002 when the victim spent the weekends at [Petitioner's] parents' house while [Petitioner] was residing there. Id., at 60. In the spring of 2002, [Petitioner] moved into a trailer, and the sexual contact continued when the victim visited [Petitioner] on the weekends. Id. at 60-68. The victim testified that in July 2002, she spent almost a full week with [Petitioner] at his trailer where [Petitioner] performed oral sex on the victim each night that she stayed there. Id., at 69-70. Trooper Goss from the Pennsylvania State Police testified that the victim approximated the week to be July 15-19, 2002. Id., at 176. [Petitioner] was charged in the criminal information with five counts of

involuntary deviate sexual intercourse for the time period between July 15-19, 2002.

[Petitioner] testified that he was not with the victim that week because he took classes in Pittsburgh during the second week of July 2002. See N.T. Jury trial, 3/16/04, at 222. [Petitioner] stated that he drove to Pittsburgh Tuesday morning and returned Tuesday evening around 11:30 p.m. Id., at 204. He indicated that he left his house again on Wednesday at 5:30 a.m. and returned on Wednesday evening around 6:30-7:00 p.m. Id., at 204. Additionally, [Petitioner] agreed that the victim resided with him for a week but he testified it was the week of June 17-21, 2002, because he did not have classes that week. Id., at 237-38.

We agree with the PCRA court that [Petitioner's] testimony did not constitute an alibi because his explanation did not place him at a different location other than at his residence on the approximate dates of the sexual contact with the victim. [Petitioner's] argument is based on timing rather than location. See Collins, at 604, 702 A.2d at 545. He asserts that he was in Pittsburgh for class during the daytime, but his own testimony placed him at his residence in the evening. The victim testified that [Petitioner] had sexual contact with her "every night" during the week. See N.T. Jury trial, 3/16/04. [Petitioner] does not assert that he was not at home in the evenings. Therefore, his testimony does not make it impossible that the sexual contact occurred at his residence, in the evenings after his return from Pittsburgh.

Because [Petitioner's] explanation does not place him at the relevant time at a different place than the scene involved and so far removed therefrom as to render it impossible for him to be the guilty party, we find his testimony did not constitute and alibi defense. Collins, at 603, 702 A.2d at 545. As such, [Petitioner] was not entitled to an alibi instruction because he did not, in fact, provide an alibi defense. Id., at 603, 702 A.2d at 545 (citations omitted). Further, because [Petitioner] was not entitled to a jury instruction on alibi, trial counsel was not ineffective for failing to request one or for failing to objection to the trial court's omission of the instruction. Id., at 604, 702 A.2d at 545; see also Commonwealth v. Spotz, 587 Pa. 1, 96, 896 A.2d 1191, 1247 (2006) (counsel will not be deemed ineffective for failing to raise a meritless claim).

(RR at 188-91).

### (b)     Standard of Review

Because the Superior Court denied this claim on the merits, this Court's analysis of it is

governed by AEDPA's standard of review. Thus, it is not for this Court to decide whether the

11

Superior Court's decision was right or wrong. Rather, this Court has the authority to issue the writ of habeas corpus only if its adjudication "resulted in a decision that was contrary to,[2] or involved an unreasonable application of,[3] clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[4] 28 U.S.C. § 2254(d).

---

[2] "The test for § 2254(d)(1)'s 'contrary to' clause is whether the state court decision 'applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of [the Supreme] Court but reaches a different result.' Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams v. Taylor, 529 U.S. 362, 405 (2000), and Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002)). Of course, a state court's resolution of a question that the Supreme Court has not resolved can be neither contrary to, nor an unreasonable application of, the Court's precedent. See Kane v. Garcia Espitia, 546 U.S. 9 (2005)." Rountree v. Balicki, 640 F.3d 530, 537 (3d Cir. 2011) (bracketed text in original) (parallel citations omitted).

[3] "The test for § 2254(d)(1)'s 'unreasonable application of' clause is as follows: '[a]n 'unreasonable application' occurs when a state court 'identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts' of petitioner's case.' Rompilla v. Beard, 545 U.S. 374, 380 (2005) (quoting Wiggins v. Smith, 539 U.S. 510, 519, 520 (2003)). For purposes of § 2254(d)(1), '[i]t is not enough that a federal habeas court, in its independent review of the legal question, is left with a firm conviction that the state court was erroneous.' Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (internal quotations omitted). "Under § 2254(d)(1)'s 'unreasonable application' clause ... a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.' Id. at 75-76, 123 S.Ct. 1166 (quoting Williams v. Taylor, 529 U.S. 362, 411 (2000)). Rather, '[t]he state court's application of clearly established law must be objectively unreasonable' before a federal court may grant the writ. Andrade, 538 U.S. at 75." Rountree, 640 F.3d at 537 (parallel citations omitted).

[4] "The test for § 2254(d)(2)'s 'unreasonable determination of facts' clause is whether the petitioner has demonstrated by 'clear and convincing evidence,' § 2254(e)(1), that the state court's determination of the facts was unreasonable in light of the record. See Rice v. Collins, 546 U.S. 333, 338-339 (2006) ('State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.' ') (quoting § 2254(e)(1)) (citing Miller-El v. Dretke, 545 U.S. 231,

The "clearly established Federal law," 28 U.S.C. § 2254(d)(1), in which to analyze Petitioner's ineffective assistance claim is governed by Strickland v. Washington, 466 U.S. 668 (1984). Under Strickland, Petitioner must show that Barrett's representation fell below an objective standard of reasonableness. 466 U.S. at 688; see also Williams, 529 U.S. at 390-91. The law presumes that Barrett was effective. Id. at 689. Strickland also requires that Petitioner demonstrate that he was prejudiced by Barrett's alleged deficient performance. This requires a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of [his trial] proceeding would have been different." Id. at 694. See also Brown v. Wenerowicz, 663 F.3d 619, 630 (3d Cir. 2011).

Since the Superior Court applied the correct legal standard when it evaluated this claim (RR at 188),[5] there can be no question that its adjudication withstands review under the "contrary to" clause of § 2254(d)(1). Williams, 529 U.S. at 406 ("a run-of-the mill state-court decision applying the correct legal rule from [Supreme Court] cases [does] not fit comfortably within § 2254(d)(1)'s 'contrary to' clause."). Thus, the only question for this Court is whether the

---

240 (2005)); see also Simmons v. Beard, 590 F.3d 223, 231 (3d Cir. 2009) ('Under the § 2254 standard, a district court is bound to presume that the state court's factual findings are correct, with the burden on the petitioner to rebut those findings by clear and convincing evidence.'). Importantly, the evidence against which a federal court measures the reasonableness of the state court's factual findings is the record evidence at the time of the state court's adjudication. Cullen v. Pinholster, — U.S. — [ ], 131 S.Ct. 1388, 1401-03 (2011)." Rountree, 640 F.3d at 537-38 (parallel citations omitted).

[5]     Pennsylvania law for judging ineffectiveness corresponds with the Strickland standard. Commonwealth v. Pierce, 527 A.2d 973, 976-77 (Pa. 1987); Commonwealth v. Kimball, 724 A.2d 326 (Pa. 1999). Although Pennsylvania courts typically articulate a three-prong test for gauging ineffective assistance claims and Strickland sets forth its test in two prongs, the legal evaluation is the same, and the differences merely reflect a stylistic choice on the part of state courts.

Superior Court's adjudication of this claim was an "unreasonable application of" Strickland or an unreasonable determination of the facts. 28 U.S.C. § 2254(d). The Supreme Court has stressed the "highly deferential" review that this Court must accord the state court's in conducting its analysis:

> We have explained that "an unreasonable application of federal law is different from an incorrect application of federal law." Williams v. Taylor, 529 U.S. 362, 410, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Indeed, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id., at 411, 120 S.Ct. 1495. Rather, that application must be "objectively unreasonable." Id., at 409, 120 S.Ct. 1495. This distinction creates "a substantially higher threshold" for obtaining relief than *de novo* review. Schriro v. Landrigan, 550 U.S. 465, 473, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007). AEDPA thus imposes a "highly deferential standard for evaluating state-court rulings," Lindh v. Murphy, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and "demands that state-court decisions be given the benefit of the doubt," Woodford v. Visciotti, 537 U.S. 19, 24, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam).

Renico v. Lett, 559 U.S. 766, 773 (2010). See also Harrington v. Richter, — U.S. —, 131 S.Ct. 770, 786 (2011) ("If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings…. It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther."). The Court also is mindful that:

> Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both "highly deferential," [Strickland, 466 U.S.] at 689, 104 S.Ct. 2052; Lindh v. Murphy, 521 U.S. 320, 333, n.7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, [Knowles v. Mirzayance, 556 U.S. at —, 129 S.Ct. 1411, 1420 (2009)]. The Strickland standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at —, 129 S.Ct. at 1420. Federal habeas courts must guard against the

danger of equating unreasonableness under <u>Strickland</u> with unreasonableness under § 2254(d). *When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard.*

<u>Harrington</u>, 131 S.Ct. at 788 (emphasis added).

### (c)    The Superior Court's decision withstand review under AEDPA

Petitioner has failed to carry his burden under § 2254(d). He argues that the PCRA court's decision to deny *all* of his ineffective assistance of counsel claims was "contrary to <u>Strickland</u>" and its progeny and criticizes that court for not considering the cumulative impact of all the of the allegations of ineffectiveness that he raised before it. [ECF No. 1 at 41]. The problem with Petitioner's argument is that, as explained above, this Court can only consider on the merits one of the four ineffective assistance claims that he raised to the PCRA court. Therefore, his argument is not relevant to the single claim of ineffective assistance before this Court. In addition, the state court decision that this Court reviews under AEDPA is the Superior Court's, since that is the last reasoned decision to consider the claim that Barrett was ineffective for failing to request an alibi instruction. <u>See</u>, <u>e.g.</u>, <u>Williams v. Beard</u>, 637 F.3d 195, 226-27 (3d Cir. 2011) (in considering a claim under § 2254, the district court reviews the "last reasoned decision" of the state courts) (citations omitted). <u>See also</u> Brian Means, Federal Habeas Manual § 3:23-25 (2013), available at Westlaw FEDHABMAN.

Petitioner does not argue that the Superior Court's decision rejecting his claim that Barrett was ineffective for failing to request an alibi instruction "involved an unreasonable application of" <u>Strickland </u>or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). That is likely because there is no credible argument to support that contention. The Superior Court

held that he was not entitled to an alibi instruction under state law because "he did not, in fact, provide an alibi defense." (RR at 192). This Court may not re-examine state court determinations on state law questions. See, e.g., Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Priester v. Vaughn, 382 F.3d 394, 402 (3d Cir. 2004); Real v. Shannon, 600 F.3d 302, 309-10 (3d Cir. 2010); Johnson v. Rosemeyer, 117 F.3d 104, 109 (3d Cir. 1997). Since Barrett cannot be found ineffective for failing to request an instruction to which Petitioner was not entitled, see, e.g., Strickland, 466 U.S. at 691, Petitioner cannot show that Barrett was ineffective, let alone that Superior Court's decision to deny relief on this claim was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, 131 S.Ct. at 786-87.

Based upon all of the foregoing, Petitioner's claim that Barrett was ineffective for failing to request an alibi instruction and for failing to object when the trial court did not provide one will be denied on the merits.

### C.  Fourteenth Amendment Due Process Claims

Petitioner's second claim is based upon the Fourteenth Amendment Due Process Clause. It is comprised of three parts. First, he claims that the prosecution violated its obligations under Brady v. Maryland, 373 U.S. 83 (1963) for failing "to advise the petitioner and/or his lawyer that Nurse Henderson did not have a Bachelor's degree in nursing." [ECF No. 1 at 43]. Second, he contends that the prosecutor knew or should have known that the entirety of Henderson's testimony was false, and that the prosecution violated his due process rights by introducing it and/or letting it go uncorrected. Third, he claims that even if the prosecution did not know or

should have known that Henderson's testimony was false, the introduction of it violated his due process rights.

### (1)    Background

In June of 2010, the *Erie Times* published an article concerning an investigation into sexual assault cases in which Nurse Henderson testified as a Commonwealth witness. The article reported that in eleven cases independent experts had concluded that Henderson's findings were "[f]alse or overblown." (RR at 242-43). Based upon this reporting, Petitioner filed a second PCRA motion pursuant to 42 Pa.C.S. § 9543(a)(2)(vi), which provides that a state prisoner may obtain post-conviction relief if he demonstrates by a preponderance of the evidence that exculpatory evidence has become available that, if it had been available at trial, "would have changed the outcome of the trial if it had been introduced." Petitioner claimed generally in his *pro se* motion that his due process rights had been violated, but he did not argue in either his *pro se* or counseled PCRA motion (RR at 272-90) that the prosecution violated his due process rights by committing a <u>Brady</u> violation or by introducing testimony that it knew or should have known was false.

In its subsequent decision, the PCRA court summarized the evidence admitted at the hearing as follows:

> [P]etitioner offered the testimony of Dr. Kathleen Brown (Brown), a leading expert and researcher in the field of forensic nursing. Brown reviewed Nurse Henderson's findings and testimony. N.T. 7/26/11, 40:19 *et seq*. After evaluating Henderson's work, Brown "was clearly able to … see" that the injuries Henderson observed were – in fact – "variations of normal." <u>Id.</u> at 44:23, 45:3. In summary, she entirely disagreed with Henderson's findings. <u>Id.</u> at 55:23-24. Brown also indicated that the available scientific evidence concerning healing rates and incidence of injury among abuse victims suggests that Henderson's finding[s] were, at least, overblown.[2]

[2] Kathleen Brown observed, "I know from my own practice and I know from research I'm conducting and I know from the literature that finding – having a physical finding that there is some healed scarring six months after an alleged incident of sexual assault is very, very unusual." N.T., 7/26/2011, 99:5-9, 47:18-23. Brown continued, observing that as early as 1994, researchers had observed that "the incidence of finding something, finding a scar of some kind in all of the children that she saw in San Diego, California was less than 5 percent and she's had several people publish similar findings since then." She concluded, "[a]pparently, this area, especially in children, heals very, very quickly … if it is a major injury two to three week[s] is what is published … all say the same thing that the healing is amazing[.]" Id. 47:23-25; 48:1-15.

Nurse Henderson testified, reaffirming her own findings despite that Dr. Brown, a leading expert and pioneer in the field of forensic evaluation, directly contradicted her findings of injury in B.B.'s case. N.T. 7/26/2011, at 55:3-24. When asked to explain the incongruity between her own individual findings and widely accepted statistics within her field, Henderson simply ignored the data. Id. at 97:19-25; 98-4-5; 99:5-9. She seemed unabashed by the disparity between her own work and the overwhelming opposition of the scientific evidence. Id. at 96:13-21.

(RR at 404-05 (additional footnotes omitted)).

After the hearing, the PCRA court issued a lengthy Memorandum in which it explained that "the evidence does not permit the Court to find purposeful or malicious misconduct on the part of the Commonwealth or draw any far ranging conclusions about Henderson's motives." (RR at 405 (footnote omitted)). It credited Dr. Brown's opinions over Henderson's. (RR at 405 ("the Court has no reservations about finding Henderson's testimony as an expert to be, at least, suspect.")); (RR at 405 n.5 ("our analysis in this case is assuming that Henderson's opinions rendered at trial were likely incorrect since we believe Dr. Brown's credentials greatly surpass those of Nurse Henderson and the reasons Dr. Brown gave for her opinions make those opinions more believable to this Court than Nurse Henderson's.")). It ultimately concluded, however, that Petitioner failed to demonstrate that he was entitled to post-conviction relief under § 9543(a)(2)(vi), which requires that the evidence discrediting Henderson's trial testimony:

"(1) be previously unavailable; (2) exculpatory; and (3) would have changed the outcome of the trial." (RR at 407). It determined that Petitioner had met the first factor but not the second or the third. The PCRA court's decision in this regard is lengthy, but it is necessary that it be recited here in full:

> The petitioner must second demonstrate that the evidence is exculpatory and not merely cumulative or solely for the purpose of impeaching credibility. Commonwealth v. Lambert, 765 A.2d 306, 325 n.15 (Pa.Super. 2000) (*observing that "exculpatory evidence is that which extrinsically tends to establish defendant's innocence of the crimes charged, as differentiated from that which, although favorable, is merely collateral or impeaching")* (citations omitted). It follows that simply impeaching an expert without a demonstration that his or her evidence was essential to the conviction is not sufficient to sustain the claim – [Commonwealth v. Fisher, 870 A.2d 864, 872, (Pa. 2005)] ("discrediting the Commonwealth's expert witness with new criticism of his scientific technique does not exculpate [a PCRA petitioner]").

> After scouring petitioner's argument as set forth in his Petition, the sum is that Henderson's disgrace combined with Kathleen Brown's findings "establish[ ] the defendant's innocence." Second Amended Petition, ¶ 75. Not only is this assertion patently untrue but – as will be discussed – it is also a non-starter under the second prong. On its face, petitioner's Second Amended Petition presents the newly discovered evidence *solely* to impeach the credibility of the Commonwealth's expert where the Commonwealth had presented other evidence in support of the conviction. Had Henderson's testimony been the only evidence used to convict petitioner, this newly discovered evidence would have been *exculpatory*, not solely impeaching. As it is, the jury may or may not have considered Henderson's testimony in their deliberation where there was other evidence of the crimes alleged. The practical effect of the statute's distinction between evidence that is exculpatory and evidence that is used *solely* to impeach is clearly seen in the analysis under the third prong.

> The third element of the subsection 9543(a)(2)(vi) analysis is whether the facts arising out of the Henderson scandal would have compelled a different verdict in the petitioner's trial. In other words, the Court must evaluate how critical the impugned evidence was to the conviction. See Fisher, 864 A.2d 871 (*evaluating the importance at trial of the challenged testimony*). And, this newly-discovered evidence proffered must be evaluated in the context of the entire trial. Commonwealth v. Kohan, 825 A.2d 702, 709 (Pa.Super. 2003), superseded on other grounds, Commonwealth v. Rivera, 939 A.2d 355, 358 (Pa.Super. 2007). "The Court must consider … the overall strength of the evidence supporting the conviction." [Commonwealth v. Padillas, 997 A.2d 356, 365 (Pa. 2010)].

The standard for granting a new trial on collateral review has been given several different articulations. The plain language of 9543(a)(2)(vi) requires that the petitioner demonstrate by a preponderance of the evidence that the newly-discovered evidence "*would have changed* the outcome of the trial." (emphasis added). The Supreme Court in <u>Fisher</u> reiterated this standard, observing that a petitioner bears the burden "to establish that such evidence *would likely compel* a different verdict." 870 A.2d at 871 (emphasis added). In <u>Commonwealth v. Alston</u>, 243 A.2d 404 (Pa. 1968), <u>Commonwealth v. Mount</u>, 257 A.2d 578 (Pa. 1969) and <u>Commonwealth v. Burgess</u>, 288 A.2d 810 (Pa. 1972), the Supreme Court provided a framework for retrospectively evaluating whether or not evidence of an expert's disqualification would compel a different verdict. These three (3) cases involve the evaluation [of] a number of convictions obtained after a laboratory technician was found to have delivered perjured testimony regarding her credentials. The general rule articulated in these cases is that "after-discovered evidence of perjury merely impeaches credibility and therefore does not justify the granting of a new trial." <u>Commonwealth v. Wilson</u>, 286 A.2d 395, 396 (Pa.Super. 1971) (Spaulding, J., concurring). The Court evaluated the merits of each claim, employing a mathematical two-prong analysis to determine whether or not the evidence would have necessitated a different verdict: (1) determining whether the newly discovered evidence, on its face, was dispositive of innocence, and if not, (2) determining whether there was sufficient evidence to sustain the conviction after subtracting the corrupted evidence.

- - -

Petitioner argues in his Second Amended Petition "this is a case in which the jury would have to weigh the credibility of the alleged victim's testimony versus the defendant's testimony" and that Henderson's testimony bolstered the victim's credibility. Second Amended Petition, ¶ 76. Petitioner continues, observing "[h]ad the Commonwealth known that Nurse Henderson's testimony was not credible, the Commonwealth would presumably not have called her as a witness." <u>Id.</u> Because the Commonwealth offered evidence in addition to Henderson to sustain petitioner's conviction, the only relevant issue raised by petitioner is the impact of Henderson's testimony on the respective credibility of the testimony offered by the victim and the petitioner.

(RR at 409-13 (footnotes omitted, emphasis in original)).

After summarizing the testimony that B.B., Henderson, and Petitioner gave at the trial

(which this Court quoted *supra*), the PCRA court continued:

In its summary of the trial evidence, the Commonwealth placed the gravamen of its argument on the testimony of the victim as it was corroborated by Henderson and petitioner's own admitted conduct. Counsel for the Commonwealth summed the evidence presented by the Commonwealth into three (3) categories: (1) the

victim's testimony; (2) the corroborating "physical evidence" of penetration provided by Henderson's testimony; and (3) the corroborating and highly irregular conduct between the victim and B.B. [The] Commonwealth observed:

> [T]he testimony of a victim [ ] standing alone if believed by you is sufficient evidence upon which you can find somebody guilty of a crime, any crime. And in this case we do have more than Melissa's[11] word for us. We have physical evidence. We have collaborating evidence and we have your common sense and your own experience on the way human beings act or should act.

> [11] Presumably, the Assistant District Attorney meant to refer to the victim at this point.

N.T., 3/17/2004, 28:20-25; 29:1-5. Petitioner's counsel observed as much in his summary of the evidence presented at trial. Respecting Nurse Henderson's testimony, petitioner's counsel observed, "the nurse can only say there was some penetration at some point by someone, by something, and that does not point to or collaborate that [petitioner] was the one who had done anything." Id. at 21:14-19. Accordingly, petitioner did not seek out an opposing expert witness. Instead, Petitioner framed the dispositive issues as "credibility" and the "relationships" between the parties. Id. at 10:10-16.

Upon review of the evidence offered at trial, petitioner has failed to meet his burden to demonstrate that the newly discovered evidence would likely compel a different verdict. The Court concludes that petitioner's (implied) claim that Henderson's testimony was critical to his conviction is an overstatement of its importance. First, the Court does not find that knowledge of Henderson's incompetence (and consequently evidence of a normal genital exam) would have unquestionably altered the outcome of the trial. Henderson's evidence was not dispositive of guilt (nor, consequently, is Brown's of innocence), but only offered to collaborate the victim's testimony. Both parties at trial downplayed or relegated the significance of Henderson's testimony in relation to the victim's testimony and the dynamics of the relationship between petitioner and B.B.

Second, a thorough review of the evidence presented at trial reveals that the Commonwealth presented sufficient evidence to sustain the conviction notwithstanding Henderson's forensic testimony. The victim presented strong, credible testimony adequately consistent with her reporting to authorities. The petitioner failed to persuasively impugn the victim's motivation or, more importantly, provide a persuasive explanation for his own, admitted and highly irregular conduct toward the victim.

At the conclusion of the trial, petitioner provided a list of vulnerabilities in B.B.['s] story including: (1) the victim['s] inability to explain her reluctance to

report the abuse for nearly seven months; (2) the victim's apparent contradiction of the case worker's testimony regarding the source of her reported suicidal impulse; (3) the victim's apparent contradiction of the forensic nurse as to when petitioner first compelled her to touch his exposed penis; (4) the victim's confused reporting of the order of events during her first sexual encounter on New Year's Eve; (5) the victim's confusion of the date of her week-long visit in the summer of 2005; (6) the victim's differing accounts of the accusation of cunnilingus; (7) and the victim's failure to explain why she continued the visits despite the abuse.

Yet, each of these vulnerabilities bears reasonable explanation without necessitating a conclusion that B.B. fabricated her claims. The victim's testimony at trial was substantially consistent with her initial reporting over two years prior – Nurse Henderson, Trooper Michael Goss, Stephanie Ace and Barbara Miller all provided evidence corroborating B.B.'s testimony. Above all, the victim's testimony received its greatest collaboration from petitioner himself.

One would suspect that a grown man seeking to cultivate a "friendship" with a pubescent girl would be more circumspect in his conduct to say the least. Instead, petitioner's admitted conduct was reckless. The frequent overnight visits were inappropriate and the amount of [time] spent along with B.B. was excessive. See Id. at 155:15-18. Petitioner failed to offer any justification for his disconcerting practice of sleeping with B.B. alone and in the same room. Id. at 194:10-17. Nor did petitioner's characterization of the relationship as that of a father-daughter or friendship provide a sympathetic context for petitioner's email communications, pet names or other behavior. In fact, the language and tone of these emails sour in light of his claimed "fatherly" intentions and B.B.'s adolescent crush on him. Id. at 210:5-22.

Petitioner was thirty-two and trusted; B.B. was twelve, vulnerable and naïve. Petitioner had no formal relationship with B.B. to justify the sleepovers, but only suspicion that he was her father – a suspicion not shared by B.B. or her mother. 155:10-14. Even still, petitioner never satisfactorily explained why he never meaningfully pursued his claimed suspicion beyond spending an immoderate amount of unsupervised time with B.B. Whether or not he believed B.B. was his daughter, his conduct with a twelve-year-old girl is wildly inappropriate for a thirty-two/three year old man whatever the context of the relationship.

In summary, the Court finds that the new revelation respecting Henderson's competence as an expert witness does not, in this case, constitute grounds to award petitioner a new trial. While Henderson's testimony may have had an effect on the central issue of the relative credibility of the victim and petitioner's testimony, it is difficult to say with any certainty what that effect was. It would seem, upon the evaluation of the evidence, that whatever the effect of her testimony, it was eclipsed by the independent strength of the victim's testimony,

and the corroboration of the victim's testimony provided by others and petitioner himself.

(RR at 414-18 (emphasis in original)).

At the end of its decision, the PCRA court observed that "[w]hile petitioner's claim fails under the rigorous tested articulated under subsection 9543(a)(2)(vi), it appears that a due process claim would have provided a firmer foothold to challenge petitioner's conviction." (RR at 418). It noted that under § 9543(a)(2)(i) or (ii), a petitioner argues that his conviction resulted from a violation of the Constitution (subsection i) or ineffective assistance (subparagraph ii) "which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." (Id.) Those two subsections, the PCRA court concluded, "provide[d] a vehicle for asserting constitutional challenges more commensurate with the effect of the Henderson's debacle on the 'fundamental fairness' of petitioner's trial." (Id.) However, the PCRA noted, Petitioner did not "raise a claim of ineffective counsel or a due process violation under subsections (i) or (ii) of section 9543," (id. at n.12), and it "is not at liberty within the narrow confines of the PCRA to litigate a petitioner's case by interposing the 'proper' claim." (RR at 419).

After the PCRA court denied Petitioner relief, he filed an appeal with the Superior Court through his counsel, Hatheway. (RR at 371-99). He claimed that the PCRA court erred when it concluded that he was not entitled to relief under § 9543(a)(2)(vi). He did not argue, as he does here, that his due process rights were violated because evidence admitted at his trial was later proven to be unworthy of confidence. He did not even mention the Due Process Clause or claim that his trial was "fundamentally unfair." Petitioner did not argue, as he does here, that the PCRA misinterpreted the claim before it. He did not argue, as he does here, that the prosecution violated

his due process rights by committing a <u>Brady</u> violation or because it introduced testimony that it knew or should have known was false. In his brief to the Superior Court, he did not cite to <u>Brady</u>, or to <u>Napue v. Illinois</u>, 360 U.S. 264 (1959), <u>Giglio v. United States</u>, 405 U.S. 150 (1972), or any other case that would have indicated that he was raising a due process claim based upon the presentation of false evidence.[6] His sole argument was that the PCRA court erred in concluding that Henderson's after-discovered incompetence did not entitle him to relief under § 9543(a)(2)(vi).

On May 11, 2013, the Superior Court affirmed "on the basis of [the PCRA court's] thorough and well-written opinion." (RR at 449).

### 2. Petitioner's Fourteenth Amendment claims are defaulted

#### (a) The <u>Brady</u> claim and the due process claim based upon the knowing introduction of false evidence

There can be no question that Petitioner never raised to the Superior Court (or the PCRA court for that matter) due process claims based upon <u>Brady</u> or the presentation of evidence that the prosecution knew or should have known was false. <u>See</u> <u>O'Sullivan</u>, 546 U.S. at 844-45 ("state prisoners must give the state courts *one full opportunity* to resolve any constitutional issues by

---

[6]    In <u>Napue</u> and <u>Giglio</u>, the prosecution made agreements with witnesses in exchange for their testimony. Both witnesses falsely denied the existence of the agreements, and the prosecutors failed to correct their false testimony. In <u>Napue</u>, the Supreme Court held that a conviction is obtained through the use of false evidence, and therefore violates the Fourteenth Amendment, when the state, "although not soliciting false evidence, allows it to go uncorrected when it appears." 360 U.S. at 269. In <u>Giglio</u>, the government's case depended almost entirely on the testimony of a witness whom the government promised it would not prosecute if he testified. The trial prosecutor had not himself made the agreement and was unaware of it, but the Court charged him with knowledge of the agreement made by his predecessor. The Court held that because the evidence was relevant to the jury's assessment of the credibility of the witness, a new trial would be "required if 'the false testimony could ... in any reasonable likelihood have affected the judgment of the jury[.]'" <u>Giglio</u>, 405 U.S. at 154 (quoting <u>Napue</u>, 360 U.S. at 271).

invoking one complete round of the State's established appellate review process."); Lambert, 387
F.3d at 233-34 (a petitioner in a non-capital case must have presented every federal
constitutional claim raised in his habeas petition to the Superior Court either on direct or PCRA
appeal). Accordingly, those claims are procedurally defaulted. See, e.g., Lines, 208 F.3d at 160;
Werts, 228 F.3d at 192; Rolan, 680 F.3d at 317.

### (b)    The due process claim based upon the introduction of false evidence

The next claim to consider is Petitioner's contention that, even if the prosecution did not
know that Henderson's testimony was false, his due process rights were nevertheless violated
because it was introduced at this trial and it has since been proven to be unworthy of confidence.
See Sanders v. Sullivan, 863 F.2d 218, 222-27 (2nd Cir. 1988) (petitioner seeking to have
conviction vacated on the ground that key witness gave materially false testimony need not show
that prosecutor was aware or should have been aware of false testimony; state's failure to remedy
conviction based on perjured testimony constitutes necessary state action under due process
clause to allow relief even absent prosecutor's involvement); Maxwell v. Roe, 628 F.3d 486, 507
(9th Cir. 2010) (suggesting that allowing a conviction to stand on the basis of false material
evidence violates due process). But see Reddick v. Haws, 120 F.3d 714, 718 (7th Cir. 1997) (the
introduction of perjured testimony, without more, does not rise to the level of a constitutional
violation warranting federal habeas relief; it is the knowing and intentional use of such testimony
by prosecuting authorities that is a denial of due process); Smith v. Roberts, 115 F.3d 818, 820
n.2 (10th Cir. 1997) (same).

Petitioner contends that he raised this due process claim to the PCRA court but that that
court ignored it or failed to recognize that the claim was before it. The problem with his

argument is that what matters is *whether he raised a due process claim to the Superior Court in his appeal*. It already has been explained that in order to exhaust a claim, Petitioner must have "fairly presented" it to the Superior Court. Importantly, to "fairly present" a claim, "a petitioner must have presented a federal claim's factual and legal substance to the state courts *in a manner that puts them on notice that a federal claim is being asserted*," McCandless v. Vaughn, 172 F.3d 255, 261 (3d Cir. 1999) (emphasis added), so that they had "a 'fair opportunity' to apply controlling legal principles to the facts bearing upon his constitutional claim," Anderson v. Harless, 459 U.S. 4, 6 (1982) (quoting Picard v. Connor, 404 U.S. 270, 276-77 (1971)). See also Baldwin v. Reese, 541 U.S. 27, 29-34 (2004); Nara v. Frank, 488 F.3d 187, 197-99 (3d Cir. 2007). "It is not sufficient that all the facts necessary to support the federal claim were before the state courts." Keller v. Larkins, 251 F.3d 408, 413 (3d Cir. 2001). Id. at 415 (a "passing reference to a 'fair trial'" is insufficient to put the state court on notice that petitioner is asserting a federal constitutional claim). "If state courts are to be given the opportunity to correct alleged violations of its prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution." Duncan v. Henry, 513 U.S. 364, 365-66 (1995) (per curiam). Thus, as the Supreme Court explained, "[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court." Id. at 366. See also Baldwin, 541 U.S. at 32 ("ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion, that does so.").

The sole claim that Petitioner raised in his appeal to the Superior Court was the state law claim that his newly-discovered evidence warranted post-conviction relief under § 9543(a)(2)(vi). Nowhere in his Concise Statement of Matters Complained of on Appeal (RR at 370-71) or in his appellate brief (RR 377-99) does he use the words "due process," or even "fundamental fairness." He did not contest the PCRA court's determination that he was not raising a due process claim under § 9543(a)(2)(i). Nor did he cite to any of the federal cases that he relies upon before this Court to support this claim. He simply has not met his burden of demonstrating that he raised this due process claim to the Superior Court. Accordingly, this claim also is procedurally defaulted.

If this Court were to find that Petitioner raised this due process claim to the state courts and they failed to recognize it was before them and, therefore, did not address it, this Court would deny it on the merits after a *de novo* review. Similarly, if this Court were to presume that the state court adjudicated Petitioner's due process claim on the merits, see Johnson v. Williams, — U.S. — , 133 S.Ct. 1088 (2013), this Court would hold that Petitioner is not entitled to relief under the standards set forth in § 2254(d). This is not minimize the "the effect of the Henderson debacle," as the PCRA court put it. However, Petitioner has not shown that he is entitled to relief under the standards applicable to reviewing claims in a federal habeas proceeding. Assuming that the trial error alleged here implicated Petitioner's due process rights, he contends that all he has to show in order to be entitled to habeas relief is that that error was "material," meaning that there is any reasonable likelihood that it could have affected the verdict. But a claim of trial error in a federal habeas proceeding is reviewed differently than it would be on direct appeal. In habeas, a federal court also must assess the actual prejudicial impact of a constitutional error in a state criminal trial under the harmless error standard articulated in Brecht v. Abrahamson,

507 U.S. 619 (1993). Brecht requires that in order to grant habeas relief a federal habeas court must find that a trial error had a "substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. at 637 (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). Fry v. Pliler, 551 U.S. 112 (2007). See also Guzman v. Sec'y Dep't of Corr., 663 F.3d 1336, 1355-56 (11th Cir. 2011) (applying Brecht harmless error analysis to a Napue/Giglio claim); Rosencrantz v. Lafler, 568 F.3d 577, 588-92 (6th Cir. 2009) (same). See also Robinson v. Arvonio, 27 F.3d 877, 884-87 (3d Cir. 1994) (same), vacated and remanded for further consideration in light of O'Neal v. McAninch, 513 U.S. 432 (1995), in which the Court clarified how a federal habeas court should apply the Brecht harmless error standard, 513 U.S. 1186 (1995). "When a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict, that error is not harmless." O'Neal v. McAninch, 513 U.S. 432, 436 (1995) (quotation marks omitted); Bond v. Beard, 539 F.3d 256, 276 (3d Cir. 2008). Because this Court is not in grave doubt that the introduction of Henderson's now-discredited testimony had a "substantial and injurious effect or influence" on the jury's verdicts, any error was harmless under Brecht. The PCRA court's reasoning is instructive on this point. It was considering whether Petitioner was entitled to relief under § 9543(a)(2)(vi), but this Court concludes for similar reasons that the alleged trial error at issue here did not have a substantial and injurious effect or influence in determining the jury's verdict.

### (c) Conclusion

Based upon all of the foregoing, each of Petitioner's due process claims will be denied as procedurally defaulted. In addition, Petitioner's claim that the admission of Henderson's now-

discredited testimony amounted to a trial error of constitutional dimension regardless of whether

the prosecution did not know or should not have known that it was false also will be denied for

the alternative reason that that alleged trial error was harmless under <u>Brecht</u>.

### D. Excusing Default Based on Evidence of Actual Innocence

Petitioner also raises what he calls his "gateway claim of actual innocence."[7] As

explained herein, Petitioner has procedurally defaulted all but one of the claims that he raises

---

[7]     A stand-alone claim of actual innocence is not cognizable in federal habeas. <u>Albrecht v. Horn</u>, 485 F.3d 103, 121-22 (3d Cir. 2007) (citing <u>Herrera v. Collins</u>, 506 U.S. 390 (1993)). <u>See also</u> FEDERAL HABEAS MANUAL § 1:60. The reason for this was given in <u>Herrera</u>. In that case, the Supreme Court held that federal habeas review is not available "absent an independent constitutional violation occurring in the underlying state criminal proceeding," and that "a claim of 'actual innocence' is not itself a constitutional claim." 506 U.S. at 400, 404. The Court explained that once a defendant is found guilty after a fair trial in the state court, he no longer is entitled to a presumption of innocence, and thus comes before the federal habeas court not as one who is innocent, but as a convicted criminal. <u>Id.</u> at 399-400. Because such a determination in the state criminal trial is "a decisive and portentous event" and "[s]ociety's resources have been concentrated at that time and place in order to decide, within the limits of human fallibility, the guilt or innocence of one of its citizens," freestanding claims of actual innocence are not reviewable in federal habeas actions. <u>Id.</u> at 401 (internal quotations and citations omitted). The Supreme Court noted that "[t]his rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution – not to correct errors of fact." <u>Id.</u> at 400. "Federal courts are not forums in which to relitigate state trials." <u>Id.</u> at 401 (quotations and citation omitted). Thus, the Court rejected Herrera's claim that, even if the proceedings that resulted in his conviction and sentence were entirely fair and error free, his innocence would make his execution a constitutionally intolerable event. Based upon the <u>Herrera</u> decision, the Third Circuit Court has held that in non-capital cases such as this case: "It has long been recognized that '[c]laims of actual innocence based on newly discovered evidence' are never grounds for 'federal habeas relief absent an independent constitutional violation.'" <u>Fielder v. Varner</u>, 379 F.3d 113, 122 (3d Cir. 2004) (quoting <u>Herrera</u>, 506 U.S. at 400); <u>Albrecht</u>, 485 F.3d at 121-22. For this reason, to the extent that Petitioner is making a stand-alone claim of actual innocence, it will be denied because it is not cognizable under the federal habeas corpus statute.

    In <u>Herrera</u>, the Supreme Court left open the possibility that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there was no state avenue open to process such a claim." 506 U.S. at 417. In <u>House v. Bell</u>, 547 U.S. 518 (2006), the Supreme Court once again left open the question of whether a truly persuasive freestanding innocence

before this Court. A petitioner who has procedurally defaulted a claim may escape the consequences of the default by claim if he can demonstrate a "miscarriage of justice."[8] This exception provides that a procedural default may be excused if the petitioner presents evidence of "actual innocence" that is "so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error[.]" Schlup v. Delo, 513 U.S. 298, 316 (1995). See also House v. Bell, 547 U.S. 518 (2006); Houck v. Stickman, 625 F.3d 88, 93-95 (3d Cir. 2010); Hubbard v. Pinchak, 378 F.3d 333, 339-41 (3d Cir. 2004). It only applies in extraordinary cases where the petitioner demonstrates that a constitutional violation has probably resulted in the conviction of one who is actually innocent. Id.; Hubbard, 378 F.3d at 339-40. "It is known as a 'gateway innocence claim' because it is the gateway through which a petitioner must pass in order to have otherwise barred constitutional claims considered." FEDERAL HABEAS MANUAL § 9B:80.

---

claim in a capital case would warrant federal habeas relief if no state avenues of relief remain available. Id. See also McQuiggin v. Perkins, — U.S. — , 133 S.Ct. 1924, 1931 (2013). In District Attorney's Office for the Third Judicial District v. Osborne, 557 U.S. 52 (2009), which was a non-capital case in which a state inmate brought an action under 42 U.S.C. § 1983 to compel the State of Alaska to release biological evidence so that it could be subject to DNA testing, the Supreme Court in dicta assumed without deciding that an actual innocence claim could be brought in habeas, but noted "the high standard any claimant would have to meet" to succeed with such a claim. Id. at 2321 (citing House and Herrera). See also Sistrunk v. Rozum, 674 F.3d 181, 187 n.2 (3d Cir. 2012). Suffice it to say that if indeed an actual innocence claim could be brought in a non-capital federal habeas case, Petitioner has fallen short of offering the type of new evidence of innocence that would entitle him to habeas relief.

[8]     A petitioner whose habeas claim is procedurally defaulted also may escape the consequences of the default by showing "cause" for the default, *i.e.*, that some objective factor "external to the defense" impeded efforts to comply with the state's procedural rule, and "actual prejudice." See, e.g., Coleman, 501 U.S. at 750; see also Murray v. Carrier, 477 U.S. 478, 488, 494 (1986). Petitioner does not argue that this applies to any of his defaulted claims.

"In an actual innocence gateway case a petitioner must demonstrate two things before his procedural default will be excused. First, a petitioner must present new, reliable evidence that was not presented at trial. Schlup, 513 U.S. at 324." Houck, 625 F.3d at 93. This Court shall assume without deciding that Petitioner has met this factor. The new evidence that he presented during the PCRA proceeding was: (1) Henderson's reputation as an expert witness in the field of forensic sexual assault examinations being considered poor among the medical community of which she was associated; and (2) Dr. Brown's testimony that she did not observe any abnormalities or injuries in the photographs of B.B.'s genitalia. (RR at 397).

"Second, a petitioner must show by a preponderance of the evidence, 'that it is more likely than not that *no reasonable juror would have convicted him in the light of the new evidence*.' [Schlup, 513 U.S.] at 327." Houck, 625 F.3d at 93 (emphasis added). This second factor is difficult to satisfy, and Petitioner has not done so here. Once again, the PCRA court's reasoning is instructive. It explained why Petitioner was not entitled to relief under § 9543(a)(2)(vi), and this Court concludes for similar reasons that Petitioner has failed to show by a preponderance of the evidence that no reasonable juror would have convicted him even in light of the new evidence.

Based upon all of the foregoing, Petitioner has failed to establish that the procedural default of any of his claims can be excused.

## III.    Certificate of Appealability

AEDPA codified standards governing the issuance of a certificate of appealability for appellate review of a district court's disposition of a habeas petition.  28 U.S.C. § 2253 provides that "[a] certificate of appealability may issue ... only if the applicant has made a substantial

showing of the denial of a constitutional right."  "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a [certificate of appealability] should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Slack v. McDaniel, 529 U.S. 473, 484 (2000). Where the district court has rejected a constitutional claim on its merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Id. Applying those standards here, jurists of reason would not find it debatable whether each of Petitioner's claims should be denied. Accordingly, a certificate of appealability will be denied.

An appropriate Order follows.


BY THE COURT:


Date: October 8, 2013                    s/Arthur J. Schwab
                                         Arthur J. Schwab
                                         United States District Judge


cc: All counsel of record